IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

---

WHITE SAND LAKE ASSOCIATION INC.,
PHEIFER BROTHERS CONSTRUCTION COMPANY, INC.,
CLARK ALBERT, RAY FRIGO, AMBER WINTER,
DENISE ODELL, CONNIE WINTER, MIKE RUMMEL,
LOUISE WALSH, and MARY LOU FISHER,

          Plaintiffs,

                                 Case No. _____

    v.

JOHN D. JOHNSON, SR., in his official capacity as President of the Lac du Flambeau Band of Lake Superior Chippewa Indians, THE TRIBAL COURT OF THE LAC DU FLAMBEAU BAND OF LAKE SUPERIOR CHIPPEWA INDIANS, THE HONORABLE MATTHEW FLETCHER, in his official capacity as Pro Tem Judge of the Tribal Court of the Lac du Flambeau Band of Lake Superior Chippewa Indians, and MELINDA YOUNG, in her official capacity as Director of the Tribal Natural Resource Department of the Lac du Flambeau Band of Lake Superior Chippewa Indians.

---

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

---

Plaintiffs, by and through their undersigned counsel, allege as follows:

## **NATURE OF THE CASE**

1.      Wisconsin residents' rights to access and enjoy this State's navigable waterways are deeply embedded in their culture and law. These rights are enshrined in the State constitution, protected among residents' real property rights, and fostered through the State's stewardship of the public trust. Defendants, all officials of the Lac du Flambeau Band of Lake Superior Chippewa Indians (the "Band"), have attempted – under color of Tribal power, but in excess of actual Tribal sovereignty and jurisdiction – to restrict, abridge, and deprive Plaintiffs of the use and enjoyment of Wisconsin navigable waters. This action is necessary to protect and vindicate these longstanding rights.

2.       White Sand Lake is a 1,229- acre natural lake located within the exterior boundaries of the Band's Reservation in Lac du Flambeau, WI (the "Lake"). The principal Plaintiffs in this action are all nonmembers of the Band, and all reside in homes on or near the Lake. Together, these individual Plaintiffs, along with other interested citizens, operate the White Sand Lake Association, an organization of homeowners and other individuals committed to protecting the Lake and its recreational and ecological resources (the "Association").

3.       For reasons explained more fully below, the Association constructed a boat launch on private property – non-Indian fee land – owned by Plaintiff Mary Lou Fisher. The Band, citing ostensible environmental concerns, claimed Plaintiffs' boat launch violated Tribal code, issued them Tribal citations, and sued them in Tribal court to enjoin Plaintiffs' use of the launch.

4.       Plaintiffs' conduct entirely complies with all applicable local, state, and federal laws. Neither the construction nor the operation of Plaintiffs' boat launch impacts – let alone threatens – the Band's economic well-being, member health and safety, or political existence. Accordingly, the Band lacks any jurisdiction over Plaintiffs – all nonmembers – their conduct, all of which occurred wholly on nonmember fee land, or Wisconsin's navigable waterways.

5.       Plaintiffs moved to dismiss the Band's claim on these grounds in the Tribal Court proceedings. But, the presiding judge refused to recognize controlling precedent – including clear decisions of the U.S. Supreme Court and the Seventh Circuit - denied Plaintiffs' motion and granted the Band's motion for a preliminary injunction preventing Association members from using their own boat launch to access the lake.

6.       Plaintiffs' only recourse is to this Court. They cannot use their own residential land except under threat of Tribal sanction. The Band's regulatory and enforcement activities conflict not only with Plaintiffs' rights, but with the inherent sovereignty of the State of Wisconsin. Plaintiffs'

attempts to raise these jurisdictional issues have fallen on deaf ears before the Tribal court, and wrongfully so. This action is therefore necessary.

## PARTIES

7.      Plaintiff White Sand Lake Association, Inc. is a Wisconsin corporation whose principal office is located at 2846 Dover Circle, Fitchburg, WI 53711.

8.      Plaintiff Pheifer Brothers Construction Company, Inc. is a Wisconsin corporation whose principal office is located at 599 Bondow Drive, Neenah, WI 54956.

9.      Plaintiff Clark Albert is an individual residing at 3097 Kiboniki Point Lane, Lac du Flambeau, WI 54538. Clark Albert is the President of the White Sand Lake Association Board, whose primary address is located at 2846 Dover Circle, Fitchburg, WI 53711.

10.     Plaintiff Ray Frigo is an individual residing at 13390 Sand Creek Lane, Lac du Flambeau, WI 54538. Ray Frigo is the Vice President of the White Sand Lake Association Board.

11.     Plaintiff Amber Winter is an individual residing at 3571 Sunfish Creek Lane, Lac du Flambeau, WI 54538. Amber Winter was the Secretary of the White Sand Lake Association Board.

12.     Plaintiff Denise Odell is an individual residing at 13200 Camp Wipigaki Lane, Lac du Flambeau, WI 54538. Denise Odell is an At-Large Director of the White Sand Lake Association Board.

13.     Plaintiff Connie Winter is an individual residing at 3571 Sunfish Creek Lane, Lac du Flambeau, WI 54538. Connie Winter is an At-Large Director of the White Sand Lake Association Board.

14.     Plaintiff Mike Rummel is an individual residing at 3301 Oriole Lane, Lac du Flambeau, WI 54538. Mike Rummel is an At-Large Director of the White Sand Lake Association Board.

15.     Plaintiff Louise Walsh is an individual residing at 12841 N. Sand Lake Drive, Lac du Flambeau, WI 54538. Louise Walsh is an At-Large Director of the White Sand Lake Association Board.

16.	Plaintiff Mary Lou Fisher is a member of the White Sand Lake Association and the property owner of 2977 County Highway H, Lac du Flambeau, WI 54538.

17.	The Lac du Flambeau Band of Lake Superior Chippewa Indians is a federally recognized Indian tribe with its principal office at 418 Old Abe Road, Lac du Flambeau, WI 54538.

18.	Defendant John D. Johnson Sr. is the President of the Lac du Flambeau Band of Lake Superior Chippewa Indians. President Johnson is sued solely in his official Tribal capacity. President Johnson's office is located at the Band's principal office, 418 Old Abe Road, Lac du Flambeau, WI 54538.

19.	Defendant Melinda Young is the Director of the Tribal Natural Resource Department of the Lac du Flambeau Band of Lake Superior Chippewa Indians. Director Young is sued solely in her official Tribal capacity. Director Young's office is located at the Band's principal office, 418 Old Abe Road, Lac du Flambeau, WI 54538.

20.	The Tribal Court of the Lac du Flambeau Band of Lake Superior Chippewa Indians is the judicial branch of the Lac du Flambeau Band of Lake Superior Chippewa Indians, and was created by the Tribal constitution. As alleged further below, the Band attempts to exercise jurisdiction over cases brought by the Band against Plaintiffs, who are nonmembers thereof. The Tribal Court is located at the Gilbert Chapman Sr. Judicial Center, 623 Peace Pipe Road, Lac du Flambeau, WI 54538.

21.	Defendant the Honorable Matthew Fletcher is the Pro Tem Judge of the Tribal Court of the Lac du Flambeau Band of Lake Superior Chippewa Indians. Judge Fletcher is sued solely in his official Tribal capacity. Judge Fletcher's office is located within the Tribal Court at the Gilbert Chapman Sr. Judicial Center, 623 Peace Pipe Road, Lac du Flambeau, WI 54538.

## JURISDICTION AND VENUE

22.	This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because it presents a controversy under the Constitution and treaties of the United

4

States. Furthermore, exhaustion or abstention in favor of tribal remedies is neither required nor appropriate because Tribal jurisdiction is plainly lacking and further Tribal Court proceedings would be futile.

23.     This Court has personal jurisdiction over the Defendants, all of whom are officials of the Lac du Flambeau Band of Lake Superior Chippewa Indians, sued in their official capacity only.

24.     Venue is proper in the Western District of Wisconsin under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

25.     This Court has the authority to enter a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

## FACTS GIVING RISE TO THE ACTION

### Principles Governing Tribal Jurisdiction of
### Nonmember Conduct on Non-Indian Fee Land Generally

26.     This case involves attempts by the Band to exert regulatory and judicial jurisdiction over Plaintiffs, all of whom are nonmembers, their privately owned, nonmember fee land, and Wisconsin's navigable waterways. The boat launch at issue is constructed on private nonmember fee land owned by an Association member, Plaintiff Mary Lou Fisher. (The Declaration of the White Sand Lake Association (the "WSLA Decl.") ¶ 2.)

27.     Ms. Fisher's property exists within the exterior boundaries of the Band's Reservation (*Id.* at ¶ 3), which was created by the Treaty with the Chippewa, Sep. 30, 1854, 10 Stat. 1109 (the "1854 Treaty"). Through the 1854 Treaty, the Band agreed to "cede…all the lands heretofore owned by them in common with the Chippewa of the Mississippi . . . " to the United States. *Id.*, art. 1. In exchange, "[t]he United States agree[d] to set apart and withhold from sale, for the use of the Chippewas of Lake Superior" certain Reservation land, the precise boundaries of which were set by subsequent presidential order. *Id.*, art. 2.

5

28. The Tribal constitution purports to give the Tribe regulatory and judicial jurisdiction over "all the land and water areas within the territory of the Band" and "to all lands and waters described in treaties to which the Band was a party, which treaties provide for [usual rights of occupancy.]" LDF Tribal Const. art. I, § 2. The Tribal Constitution defines the "territory of the Band" as it is defined by the 1854 Treaty. *Id.*, art. I, § 1.

29. The Band based the claims it filed in Tribal Court against Plaintiffs on alleged violations of Chapters 21, 23, and 66 of the Tribal Code. (The Declaration of Joseph L. Olson (the "Olson Decl.") ¶ A, Ex. A.) Each of these Chapters only applies – by its express terms – to the lands defined by the 1854 Treaty. *See* LDF Tribal Code Ch. 21.101(2); Ch. 23.107, 23.108(4); Ch. 66.109, 66.110(15).

30. But, this Court has already determined that the 1854 Treaty does not grant the Band jurisdiction over the navigable waterways in the State of Wisconsin that are otherwise within the exterior borders of a Reservation. *Wisconsin v. Baker*, 524 F. Supp. 726 (W.D. Wis. 1981), *aff'd* 698 F.2d 1323 (7th Cir. 1983). *See also Wisconsin v. Johnson*, No. 26-cv-401-wmc, 2026 WL 1746659, at *4 (W.D. Wis. June 17, 2026) (noting that this Court is "bound by the Seventh Circuit's interpretation of the 1854 treaty in *Baker*"). Therefore, by the Band's own laws, it plainly lacks jurisdiction over the claims it pressed in the Tribal Court.

31. Even so, the Band's lack of jurisdiction is confirmed by decades of United States Supreme Court precedent. By entering the 1854 Treaty, the Band necessarily and fundamentally altered the nature of the sovereignty it previously possessed as a nation. *See Montana v. United States*, 450 U.S. 544, 563 (1981) ("through their original incorporation into the United States as well as through specific treaties and statutes, the Indian tribes have lost many of the attributes of sovereignty.")

32. Through the *Montana* line of cases, the Supreme Court has clearly articulated that while tribes retained inherent sovereignty to govern tribal members on tribal lands, "tribes do not, as a general matter, possess authority over non-Indians who come within their borders: 'The inherent

sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe.'"

*Plains Com. Bank v. Long Fam. Land & Cattle Co.*, 554 U.S. 316, 328 (2008) (quoting *Montana*, 450 U.S. at 565).

33.     And, this presumption against tribal jurisdiction over nonmember conduct "is particularly strong when the nonmember's activity occurs on land owned in fee simple by non-Indians." *Id.* (citing *Strate v. A-1 Contrs.*, 520 U.S. 438, 446 (1997)).

34.     Likewise, a Tribe has no jurisdiction to regulate the use of fee land owned by non-Indians:

> *Our cases have made clear that once tribal land is converted into fee simple, the tribe loses plenary jurisdiction over it. . . . Moreover, when the tribe or tribal members convey a parcel of fee land "to non-Indians, the tribe loses any former right of absolute and exclusive use and occupation of the conveyed lands*." *South Dakota* v. *Bourland*, 508 U.S. 679, 689, 113 S. Ct. 2309, 124 L. Ed. 2d 606 (1993) (emphasis added). This necessarily entails "the loss of regulatory jurisdiction over the use of the land by others." *Ibid.* **As a general rule, then, "the tribe has no authority itself, by way of tribal ordinance or actions in the tribal courts, to regulate the use of fee land."** *Brendale* v. *Confederated Tribes and Bands of Yakima Nation*, 492 U.S. 408, 430, 109 S. Ct. 2994, 106 L. Ed. 2d 343 (1989) (opinion of White, J.).

*Plains Com. Bank,* 554 U.S. at 328-29 (emphasis added).

35.     Supreme Court precedent has recognized two exceptions to this general rule against tribal jurisdiction over nonmembers on nonmember fee land. First, a tribe may regulate where jurisdiction exists due to "consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." *Montana*, 450 U.S. at 565. Second, "[a] tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Id.* at 566. As shown below, neither of these exceptions applies here.

**Principles Governing Tribal Regulation of Navigable Waterways in Wisconsin**

36.     The Band's exercise of jurisdiction over Plaintiffs also implicates public and private

7

interests in access to Wisconsin's navigable waterways. This places the Band's assertion of jurisdiction at its lowest possible ebb.

37.     Indeed, in decisions rendered over forty years ago, this Court, in *Baker*, 524 F. Supp. 726, affirmed by the Seventh Circuit, 698 F.2d 1323, confirmed that the Band lacks regulatory jurisdiction over nonmember conduct on navigable waterways in this state despite their physical location inside the exterior boundaries of their Reservation. In *Baker*, this Court, interpreting the 1854 Treaty, held that "the State of Wisconsin enjoys exclusive sovereignty over the navigable waters lying within the outer boundary of the [band's] reservation . . . with respect to the use of those waters by nonmembers of the" Band, and that the band and its officials "lack power to regulate the use of those waters by such nonmembers." *Baker*, 524 F. Supp. at 733.

38.     The Seventh Circuit affirmed, holding that "the 1854 treaty did not convey to the Band sovereignty over navigable waters within its reservation and that exclusive sovereignty over them is in the State." *Baker*, 698 F.2d at 1335. Thus, the Band's actions alleged here represent illegal attempts to exert jurisdiction over the navigable waters of White Sand Lake.

39.     Most directly, the Band has sought to restrict Plaintiffs' ability to access the Lake via their own boat launch and to operate motorboats on the Lake. (*See* Olson Decl., Ex. A.) In addition to impermissibly regulating the Lake, these restrictions violate and abridge Plaintiffs' riparian rights that Wisconsin common law protects for property owners. These rights include, but are not limited to, the right to reasonable use of the water for domestic, agricultural, and recreational purposes, the right to use the shoreline, and the right to construct piers or similar structures in aid of navigation, subject to statutory and regulatory limitations. *Sea View Estates Beach Club, Inc. v. State Dep't of Nat. Res.*, 223 Wis. 2d 138, 157, 588 N.W.2d 667 (Ct. App. 1998). *See also R.W. Docks & Slips v. State*, 2001 WI 73, ¶ 21, 244 Wis. 2d 497, 628 N.W.2d 781; *State v. Bleck*, 114 Wis. 2d 454, 466, 338 N.W.2d 492 (1983); *Stoesser v. Shore Drive P'ship*, 172 Wis. 2d 660, 666 n.2, 494 N.W.2d 204 (1993).

40. The Band has attempted to justify its bar on Plaintiffs' use of the launch, and punishing the construction of it, as an exercise of Tribal regulation of White Sand Lake. (*See* Olson Decl., Ex. A.) Specifically, and as described below, the Band claims that in order to curb the spread of an invasive aquatic species, Eurasian watermilfoil, on White Sand Lake, they must regulate motorboat traffic on the Lake. (*Id.*) These justifications thus implicate two additional regulatory spheres: the mitigation and control of aquatic invasive species in Wisconsin's waters, and public access to and enjoyment of navigable waterways in Wisconsin.

41. Both of these regulatory spheres are peculiarly the concern of the State of Wisconsin.

42. This State concern stems from the State's stewardship of the public trust over navigable waterways. This doctrine is enshrined in Wisconsin's constitution, established in its common law, and ensures that navigable waters are "common highways and forever free" for public use, without taxation or restriction. Wis. Const. art. IX, § 1; *see also Rock-Koshkonong Lake Dis. v. State Dep't of Nat. Res.*, 2013 WI 74, ¶ 87, 350 Wis. 2d 45, 833 N.W.2d 800. The doctrine has been interpreted broadly to encompass not only navigation but also recreational activities such as boating, swimming, fishing, and hunting, as well as the preservation of scenic beauty. *Rock-Koshkonong*, 350 Wis. 2d 45, ¶ 72; *see also Wisconsin's Env't Decade, Inc. v. Dep't of Nat. Res.*, 85 Wis. 2d 518, 526, 271 N.W. 2d 69 (1978); *Movrich v. Lobermeier*, 2018 WI 9, ¶ 27, 379 Wis. 2d 269, 905 N.W.2d 807.

43. The public trust doctrine in Wisconsin applies to all navigable waters and imposes a duty on the State to protect and preserve these waters for public purposes, including access for navigation and recreation. *Rock-Koshkonong*, 350 Wis. 2d 45, ¶ 87; *see also Wisconsin's Env't Decade*, 85 Wis. 2d at 526; *Movrich*, 379 Wis. 2d 269, ¶ 27.

44. Additionally, while the State of Wisconsin and the Chippewa Tribes have established a long-term process for communicating about and coordinating management of natural resources, the State of Wisconsin "will continue to bear the responsibility and authority for the management of all

9

of the natural resources of the state as provided [in this Court's decisions]." *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Wisconsin*, 775 F. Supp. 321, 323 (W.D. Wis. 1991).

45.    To that end, the State has utilized its broad jurisdiction to effectuate policy and regulatory schemes for navigable waterways that cover – and conflict with – both subjects the Band is attempting to regulate here. First, Wisconsin has enacted robust environmental policies to address the proliferation of invasive aquatic species generally, and Eurasian watermilfoil specifically. *See, e.g.*, Wis. Stat. 23.22(2)(a) ("The [WI DNR] shall establish a statewide program to control invasive species in this state."). *See also, e.g.*, Wis. Admin. Code NR § 40.05(2)(b)34 (naming Eurasian watermilfoil as a restricted species).

46.    The Band's enforcement efforts here meddle with and frustrate State programs, including those targeting Eurasian watermilfoil, the precise harm the Band seeks to address through its actions here. The Band has rejected offers from the State, the Association, and others to assist with the Eurasian watermilfoil issue on the Lake, and refuses to participate in or cooperate with State programs to address the issue.

47.    For example, the Association received an AIS ("Aquatic Invasive Species") Early Detection and Response Grant from the DNR to fund Eurasian watermilfoil removal from the Lake. The Association approached the Band about utilizing those funds as intended. The Band rejected the Association's overtures on multiple occasions, specifically stating that it would not accept the money because it came from the State and because the offer came through the Association. The Band has further harassed and threatened surveyors and others who have inspected the Lake in an effort to address the Eurasian watermilfoil issue. The perceived risk of punishment and harassment by the Band has made it difficult to find contractors or volunteers to assist with the remediation efforts.

48.    The State operates numerous programs that similarly target Eurasian watermilfoil. The Band refuses to participate in any of those programs in protecting White Sand Lake.

10

49.    Second, it has enacted a comprehensive regulatory scheme governing the construction, maintenance, and operation of shoreline structures – such as wharves, piers, and boat launches – on private and public land intended to protect Wisconsinites' reasonable access to waterways. *See generally* Wis. Stat. ch. 30, Navigable Waters, Harbors, and Navigation.

50.    The Band's efforts to enforce its internal laws against Plaintiffs here directly conflicts with the State's regulatory scheme for shoreline structures, and further exceeds the Band's limited regulatory authority.

### The Band's Enforcement Actions and Tribal Court Proceedings

51.    Prior to 2023, the Individual Plaintiffs and other Association members primarily gained boating access to White Sand Lake through a public boat launch owned and operated by the Band. (WSLA Decl. ¶ 4.)

52.    In 2023, the Band claimed that Eurasian watermilfoil infested the Lake, and asserted that motorboat traffic was the primary cause of the infestation and spread of Eurasian watermilfoil to various parts of the lake. The Band responded by closing its boat launch, first temporarily, then indefinitely beginning with the 2024 season. (*Id.* ¶ 5.)

53.    Other launches remained in operation on White Sand Lake, but these other launches are private and either refused the public use of the launch or charged a fee – often as high as $100 per craft – to use. (*Id.* ¶ 6.)

54.    Therefore, the Association decided to construct its own boat launch for its members' use. It planned the boat launch for shoreline property owned by Association member Ms. Fisher and hired Pheifer Brothers Construction Company, Inc. to perform the work. (*Id.* ¶ 7.)

55.    The Association obtained all necessary permits and approvals to construct the launch. It obtained a permit from Vilas County, in accordance with Wis. Stat. ch. 30, to construct the shoreline launch. (*Id.* ¶¶ 10-11 and Ex. A.) Shortly after applying for the permit from the County, the Band

issued a letter asserting that the Association also needed approval from the US Army Corps of Engineers, and Band approval. (WSLA Decl. ¶ 12.)

56.     The Association consulted with the U.S. Army Corps, which informed it that no federal approval was necessary to continue with the project. (*Id.* ¶ 13 and Ex. B.) The Association also consulted with outside Counsel who confirmed in a written opinion letter, which was shared with the Band, that Tribal approval was not required. And, because the Band lacks jurisdiction over this matter, the Association did not seek Tribal approval for it. (WSLA Decl. ¶ 13.)

57.     The Association also consulted with the Wisconsin DNR and the Environmental Protection Agency. The Association was informed by both agencies that no permits or approvals from them were required to construct the boat launch. (*Id.* ¶¶ 14-15 and Ex. C.)

58.     The Association also retained Environmental Protection Industries, an environmental engineering firm, which opined that the construction of the boat launch would not impede or impact the quality of the water of White Sand Lake, nor would it have a negative effect on the surficial stability of the in-situ soil deposits. (*Id.* ¶¶ 16-17 and Ex. D.)

59.     On May 15, 2025, while the launch was under construction, the Band issued citations for violations of its Tribal Natural Resources Code to three Plaintiffs: Ms. Fisher, Clark Albert, and Pheifer Brothers Construction Company, Inc. Each of these citations alleged violations of Tribal Code provisions prohibiting the "waste" of "wild" plants and animals during the "harvest" of them. (*Id.* ¶¶ 20-21 and Ex. E (citations stating plaintiffs "did unreasonably waste, destroy, or impair wild plants while harvesting said plants on shore of White Sand Lake" and listing a penalty up to $5,000.00).

60.     In support of these citations, the Band claimed only that the Plaintiffs had cleared sundry vegetation and trees from the boat launch's proposed path on Ms. Fisher's private, fee-simple property. (*Id.*)

61.     Construction of the boat launch was completed by June 2025. (*Id.* ¶ 23.)

62.     On June 10, 2025, the Band filed a civil action in Tribal Court against the Plaintiffs, alleging violations of various provisions of the Tribal code and seeking an injunction barring Plaintiffs' use of the boat launch permanently.

63.     The Band asserted that Plaintiffs violated LDF Tribal Code §§ 21.701-709 (the Non-member Conservation Code) by "unreasonably wasting, injuring, destroying, or impairing any wild plant, animal, or fish while engaging in the harvest of said species"; LDF Tribal Code §§ 23.301-23.906 (the Shoreline Protection Code) by building the boat launch "which has the potential to impair water quality by spreading the Eurasian water-milfoil infestation to other areas of the lake"; and LDF Tribal Code § 66.110(26) (the Cultural Protection Code) by building the boat launch because it is a "project, activity, or program…that may have potential to affect a historic property, burial site, human remains, sacred site or traditional property".

64.     After Plaintiffs moved to dismiss the Tribal Court action on jurisdictional grounds, the Band filed an Amended Complaint, which largely repeated the allegations of the original. (*See* Olson Decl., Ex. A (asserting violations of the Nonmember Conservation Code, the Boating Safety Ordinance, the Water Quality Standards Code, and the Cultural Protection Code).[1] Again, Plaintiffs moved to dismiss, asserting that the Band lacked jurisdiction over them or their conduct on nonmember fee land. (Olson Decl., Ex. B.)

65.     Tribal law prohibits the Band's Chief Judge, the Honorable Garold Smith, from hearing civil cases to which the Band is a party. Although Judge Smith is still presiding over the Band's

---

[1] The asserted violations of the Boating Safety Ordinance and the Water Quality Standards Code were new allegations in the Tribe's Amended Complaint. The Boating Safety Ordinance, LDF Tribal Code § 27.508 provides that the Tribe may "seek to obtain an injunction…against any person subject to this ordinance who undertakes activities which have any of the following effects: (1) obstruct a stream, (2) impair water quality, (3) disturb or impair fish reproduction, or (4) create a hazard to public health." The Water Quality Standard Code, LDF Tribal Code § 28.107(3), provides that the "existing ambient water quality [may not] be lowered as a result of an action attributable to human activities."

action to enforce the Tribal Citations, he was forced to recuse from presiding over the Tribe's Amended Complaint and Amended Motion for Preliminary Injunction (the "Tribal Court case").

66. In his place, the Band specifically selected Professor Matthew Fletcher to preside over the Tribal Court case. This was not the first time the Band selected Professor Fletcher to preside over a case in which the Band was asserting jurisdiction over nonmembers or their activities occurring exclusively on nonmember fee simple land.

67. Professor Fletcher is the Harry Burns Hutchins Collegiate Professor of Law and Professor of American Culture at the University of Michigan. He is a prolific writer, and has produced significant scholarship on numerous aspects of Native American legal studies. As part of this work, Professor Fletcher has articulated a robust, expansive, and novel theory of tribal jurisdiction over nonmembers. This theory expressly turns on a rejection of the Supreme Court's settled framework developed through *Montana* and its progeny. And, he has effectuated his theory through Tribal Court cases, including against Plaintiffs.

68. Professor Fletcher explained his theory in a law review article published in the University of Colorado Law Review, titled "Resisting Federal Courts on Tribal Jurisdiction." Matthew L.M. Fletcher, *Resisting Federal Courts on Tribal Jurisdiction*, 81 Colo. L. Rev. 973 (2010). (Olson Decl., Ex. C.) In that article, Professor Fletcher questioned the validity of Supreme Court's tribal jurisdiction doctrine, including *Montana*. *Id.* at 1003. This article explicitly calls for tribal court rejection of the *Montana* framework in tribal court cases involving nonmembers, including civil cases. *Id.* at 1003-05.

69. Indeed, at page 1003 Professor Fletcher writes: "It is time for Indian tribes to actively and strategically resist the [U.S.] Supreme Court in the context of tribal court civil jurisdiction over nonmembers." Professor Fletcher made clear that the first step in his novel theory is to reject the *Montana* framework and to look instead to tribal law to determine whether a tribe has jurisdiction over nonmembers. *Id.* at 1003-4.

14

70.     Professor Fletcher makes it clear that he is not advocating for persuasively attempting to alter the current state of federal law, but rather, for tribes to simply reject and/or ignore the federal judiciary:

> But a second and more important step is to resist the federal judiciary's assertion of jurisdiction to determine tribal court jurisdiction, a step which might include tribal court efforts to assert civil jurisdiction over nonmembers, perhaps even in the face of a federal order to halt.

*Id.* at 1004.

71.     Professor Fletcher has at least twice put his theory into practice while acting as Judge for the Tribal Court. The first was in a prior civil case involving the Band's claims that another nonmember entity's activities, which occurred exclusively on nonmember fee land, had violated the Tribal environmental code. *See Lac du Flambeau Band of Lake Superior Chippewa Indians v. Howard Bros. Inc.*, No. 23-CV-109 (LDF Band of Lake Superior Chippewa Indians Tribal Ct. Oct. 28, 2024). There, Judge Fletcher rejected *Montana* and its progeny, and instead elevated Tribal law to determine jurisdiction. And, because the Band's constitution and laws purport to grant its court's jurisdiction over nonmembers, Judge Fletcher found jurisdiction. *Id.* at 8 ("The tribal constitution does not allow mere federal common law to restrict the powers of the Tribe, but the tribal choice of law statute does allow the Court to consider the common law precedents of the federal judiciary."). In the process, Judge Fletcher relegated the *Montana* lineage to mere persuasive authority.

72.     Judge Fletcher relied heavily on his own decision in *Howard Bros.* in denying Plaintiffs' jurisdictional arguments. Quoting his *Howard Bros.* decision, Judge Fletcher explained that the Tribal Court's jurisdictional authority derives from tribal law, not federal law.  Further, Judge Fletcher's analysis relegated federal law to mere persuasive authority, on par with the laws of other tribes:

> This court must apply the laws of the Tribe first, that is, the Constitution, tribal codes and ordinances, and customs and traditions of the Tribe. *See* Tribal Code of the Lac du Flambeau Band of Lake Superior Chippewa Indians § 80.306(1). If tribal laws do not address an issue, the Court may then apply the laws of another tribe or the federal government as persuasive authority. *See* § 80.306(2). If tribal or

15

federal laws do not address an issue, the Court may then apply laws of any state as persuasive authority. *See* § 80.306(3).

(Olson Decl., Ex. D (Tribal Court Order) at 3.)

73. Applying his self-made rule, the Court rejected the rule of *Montana*. Judge Fletcher explained that because Tribal law granted jurisdiction, and because there was no express federal constitutional or statutory provision stripping jurisdiction, *Montana*, and its progeny, was "inapposite."

74. Judge Fletcher's decision in the tribal court case proceeded to apply this same logic to *Baker*. According to Judge Fletcher, *Baker* relies on the rule of *Montana*. And, because he found that *Montana* was inapposite, *Baker* suffered a similar fate. Without analyzing, or even recognizing, the express holding and clear implications of *Baker*, Judge Fletcher disregarded the case – which analyzed the precise jurisdictional issues under the same treaty as the matter before him – out of hand.

75. This ruling ignored the fact that *Baker* controls on questions of tribal jurisdiction over the use and regulation of navigable waters in Wisconsin, a fact that this Court reiterated in a recent and highly analogous case. *See Wisconsin v. Johnson*, No. 26-cv-401-wmc, 2026 WL 1194962 (W.D. Wis. May 1, 2026) (granting the State of Wisconsin's motion for a temporary restraining order); *See also Johnson*, 2026 WL 1746659, at *4 (granting the State of Wisconsin's motion for a preliminary injunction finding that "the Band has not even come close to showing that nonmember fishing of walleye and muskellunge on Reservation lakes is necessary to avert catastrophic consequences").

76. Accordingly, the Tribal Court found jurisdiction over Plaintiffs, denied Plaintiffs' motion to dismiss, and granted the Band's request for a preliminary injunction enjoining Plaintiffs' use of the boat launch on their own fee simple property. (*See* Olson Decl., Ex. D.)

77. The Court's decision has left the Association and its members unable to use their own property to access the Lake, and without a mechanism by which to access White Sand Lake to exercise their riparian rights without paying significant fees to the owner of a different private boat launch to do so. The Association is facing another season of paying heavy fees – up to $100 per launch and pull

16

out – to launch and retrieve their boats at other locations on the Lake with significant uncertainty surrounding future access and interference by the Band.

78.    This enforcement activity fits into a broader pattern of targeted actions by the Band against the Association and its members. This includes actions that conflict with State environmental programs. For example, the Association has been granted funds through a DNR program to remediate Eurasian watermilfoil on White Sand Lake. (WSLA Decl. ¶ 19.) The Band refused the funds or the Association's assistance because they were part of a state program. (*Id.*) Additionally, while the Band has gone to great lengths to punish and prevent the Association from accessing the Lake through their launch, numerous other launches (approximately twenty-eight) remain operating on the Lake. (*Id.* ¶ 8.) And, the Band now selectively opens its own (previously public) launch for the exclusive use of members of the Band. (*Id.* ¶ 5.) Notably, the Band's launch is in the area of greatest concentration of invasive milfoil on White Sand Lake; yet, it is still in use by the Band.

### The Band Lacks Jurisdiction, and Exhaustion is Not Necessary

79.    Federal law recognizes a federal common law cause of action – under 28 U.S.C. § 1331 – to challenge tribal court jurisdiction. *Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845 (1985). Courts generally require parties seeking to invoke this cause of action to first exhaust tribal court remedies. This is, however, only a prudential requirement, and federal courts allow nonmembers to seek redress in federal court, without first exhausting tribal remedies, to adjudicate tribal court jurisdictional issues in certain circumstances. *See Evans v. Shoshone-Bannock Land Use Policy Comm'n*, 736 F.3d 1298, 1302 (9th Cir. 2013).

80.    Indeed, federal courts recognize multiple exceptions to the tribal exhaustion rule, three of which are implicated here, allowing immediate jurisdiction in this Court. First, tribal exhaustion is not required in cases where tribal court jurisdiction is "plainly lacking," second, where tribal jurisdiction is patently violative of express jurisdictional prohibitions, and third, where requiring "exhaustion

17

would be futile because of the lack of an adequate opportunity to challenge the tribal court's jurisdiction." *Id.*[2] (quoting *Elliot v. White Mt. Apache Tribal Ct.*, 566 F.3d 842, 847 (9th Cir. 2009)).

81.     The first and second exceptions apply here for the same reasons. The Band has no plausible claim of jurisdiction.

82.     The Band alleges it has jurisdiction over nonmember Plaintiffs, their land, and Wisconsin's navigable waterways. As outlined below, *Montana* precludes the Band's jurisdiction over Plaintiffs and their land, while *Baker* precludes the Band's jurisdiction over Wisconsin's navigable waterways.

83.     Indeed, the Band's own internal laws preclude Tribal Court jurisdiction over the claims it asserts against Plaintiffs. By their very terms, Tribal law limits jurisdiction to the lands and waters granted to the Band under the 1854 Treaty. Yet, both this Court and the Seventh Circuit have long ago determined the 1854 Treaty did not grant the Band the jurisdiction it asserts over navigable waters. *See Baker, supra.* The Band cannot make a colorable claim to jurisdiction its own laws do not recognize.

84.     Furthermore, as explained above, federal law presumes bands lack jurisdiction over nonmember conduct on nonmember fee land. The Band's claim to jurisdiction here is its furthest ebb, as it materially conflicts with Wisconsin's exclusive sovereignty over public trust waterways and enacted policy choices, as well as Plaintiffs' riparian rights.

85.     Moreover, the Band cannot invoke either exception to *Montana* to create jurisdiction. The Band has never claimed jurisdiction based on consent; there is none. And, the Band cannot show a sufficient threat caused by Plaintiffs' conduct to warrant jurisdiction under the second *Montana* exception.

---

[2] Tribal-court exhaustion is also not required when an assertion of tribal court jurisdiction is "motivated by a desire to harass or is conducted in bad faith" *Nevada v. Hicks*, 533 U.S. 353, 369 (2001) (quoting *Nat'l Farmers Union*, 471 U.S. at 856, n.21). Plaintiffs do not waive their right to argue that this exception also applies. *See ¶* 77 (outlining the Band's targeted actions against the Association).

86.     The Band has claimed Plaintiffs' conduct has and will impact the environment in and around White Sand Lake. But, these claims – assuming they could be proven true - do not rise to the sort of existential threats that trigger the second *Montana* exception. *See Johnson*, 2026 WL 1746659, at *3 ("the Band relies on a narrow, so-called exception recognized in *Montana*…that permits Bands to act when something 'threatens or has some direct effect on the political integrity, the economic security, or the health and welfare of the tribe") (quoting *Montana*, 450 U.S. at 566) and *4 ("the Supreme Court has held that for this exception to apply, the challenged conduct cannot merely injure a Tribe but must 'imperil the subsistence' of the tribal community such that 'tribal power must be necessary to avert catastrophic consequences'") (quoting *Plains Com. Bank*, 554 U.S. at 341). Some of the Band's claims allege the Defendants (Plaintiffs here) neglected to follow the proper permitting procedure through the relevant tribal authorities. Such alleged administrative violations do not under any reasonable interpretation imperil the Band's continued existence.

87.     The Band also does not allege the boat launch has or will imperil environmental conditions on the reservation. The Amended Complaint alleges that the boat launch's construction required some vegetation clearing on Ms. Fisher's private land, and that use of the launch ***could*** contribute to the spread of Eurasian watermilfoil; ***could*** affect fish spawning and reproduction; and ***could*** affect aquatic wildlife growth. But, beyond implying these are potential problems to be remedied, the Amended Complaint does not allege any actual facts that show how they imperil the Band's political sovereignty, economic security, or health and welfare. Indeed, the Amended Complaint merely alleges that the boat launch "has the ***potential*** to impair water quality". (Olson Decl., Ex. A (Am. Compl.) ¶ 56; *Johnson,* 2026 WL 1746659, at *4 ("the Supreme Court has held that for this exception to apply, the challenged conduct cannot merely injure a Tribe but must 'imperil the subsistence' of the tribal community such that 'tribal power must be necessary to avert catastrophic consequences'") (quoting *Plains Com. Bank*, 554 U.S. at 341).) Even assuming these allegations constitute violations of tribal law

19

at all, they surely fail to show why or how the Plaintiffs' activities "imperil" the Band in any way. The Band further fails to explain why this single landing on the Lake, where around twenty-five other private landings exist, poses extreme jeopardy for the Band, but the others do not, including the Band's own landing which remains in use by the Band, but closed to non-members.

88.     The Band has not alleged and cannot establish that the Defendant's boat launch constitutes so grave a threat to tribal existence as to overcome the strong presumption against jurisdiction. The Amended Complaint does not establish the exception to the *Montana* rule of non-jurisdiction exists.

89.     The lack of tribal jurisdiction is expressly stark given this Court's decision in *Baker*, which explicitly held that sovereignty over navigable waters resides exclusively with the State. And, under the holding and logic of *Baker*, the State's continued regulation of navigable waterways, including and especially of the environmental and water-access issues implicated by the Band's enforcement against Plaintiffs, makes tribal jurisdiction all the more implausible:

> It is inconceivable that the exclusive power to regulate nonmembers' use of the navigable waters in the [band's] reservation might have resided in the State of Wisconsin in 1848, 1854, and 1876, but that at some time since, that exclusive power shifted to the [band] by virtue of changes in circumstances which caused the State's possession of that power to pose too severe a threat to the sovereignty of the [band].

*Baker*, 524 F. Supp. at 735.

90.     Tribal jurisdiction is plainly lacking. It does not exist under Tribal law, and it was given up by the Band when it acceded to the 1854 Treaty.

91.     And yet, Plaintiffs lack an adequate opportunity to vindicate their jurisdictional arguments before the Tribal Court. Judge Fletcher has on at least three occasions reasserted his novel theory of tribal jurisdiction, including in rejecting Plaintiffs' *Montana-* and *Baker*-based arguments once already in this case. Based upon Professor Fletcher's writings, opinions and work, and his rulings based on that work as Tribal judge—which are directly contrary to settled and controlling federal law—

20

Plaintiffs cannot reasonably expect to have this controlling federal law applied in their case in Tribal Court.

92.     Accordingly, under federal law, the Band plainly lacks jurisdiction over the claims asserted in the Tribal Court. Plaintiffs do not have an adequate opportunity to assert those claims in that Court. Tribal jurisdiction does not exist, and exhaustion is not required. This Court may exercise immediate jurisdiction.

## FIRST CAUSE OF ACTION: DECLARATORY JUDGMENT
### (Acts in Excess of Tribal Authority)

93.     Plaintiffs re-allege and incorporate by reference the above allegations as if fully set forth herein.

94.     Whether Defendants may exercise regulatory or adjudicatory authority over Plaintiffs is a federal question.

95.     Plaintiffs are entitled to a declaration that Defendants lack regulatory and adjudicatory jurisdiction over Plaintiffs with respect to the conduct alleged in the Tribal Court action and the Citations.

96.     Subject to narrow exceptions, tribes lack civil authority over the conduct of nonmembers on nonmember fee land within a reservation.

97.     Neither narrow *Montana* exception applies here.

98.     The property at issue is nonmember fee land within the exterior boundaries of the Reservation, and Defendants' efforts to regulate activity by nonmembers on this nonmember fee land are therefore invalid under federal law.

99.     Defendants' contrary actions exceed the authority granted to the Band by both Tribal and federal law to regulate nonmembers.

100.     An actual controversy exists concerning whether Defendants may continue to prosecute the Citations or maintain the Tribal Court action against Plaintiffs.

101.    Plaintiffs have standing because Defendants' assertion of jurisdiction subjects them to ongoing legal restraint and injury.

102.    The dispute is ripe because the Band has already invoked Tribal Court process and obtained injunctive relief against Plaintiffs.

103.    For the reasons alleged above, further exhaustion of tribal remedies is unnecessary and futile.

104.    Declaratory relief will clarify the parties' legal rights, terminate the present jurisdictional dispute, and prevent further waste of party and judicial resources.

105.    Plaintiffs are therefore entitled to a declaration that Defendants lack jurisdiction to do any of the following:

  a) Regulate Plaintiffs' construction and operation of the boat launch, including by purporting to require Plaintiffs submit to Tribal permitting rules and processes and by issuing citations under the Tribal code;

  b) Denying, restricting, or abridging Plaintiffs' right to access White Sand Lake, including by selectively shutting down Plaintiffs' boat launch;

  c) Purporting to regulate nonmember access to White Sand Lake;

  d) Purporting to regulate aquatic invasive species, including Eurasian watermilfoil on White Sand Lake without sufficient justification under *Montana*; and

  e) Maintaining the civil claims in Tribal Court against Plaintiffs.

### SECOND CAUSE OF ACTION: PRELIMINARY INJUNCTIVE RELIEF

106.    Plaintiffs re-allege and incorporate by reference the above allegations as if set forth herein.

107.    Plaintiffs are entitled to preliminary injunctive relief halting the Defendants from pursuing their current and any further claims against Plaintiffs in Tribal Court and preventing the Defendants from enforcing the Citations.

22

108.    Absent an injunction, Plaintiffs will continue to suffer immediate and irreparable harm from Defendants' unlawful assertion of jurisdiction and restraint on Plaintiffs' use of their property.

109.    Being forced to defend against unlawful tribal proceedings is itself an irreparable injury not fully compensable by money damages.

110.    Plaintiffs have no adequate remedy at law because this action is their only practical means of obtaining relief from Defendants' assertion of jurisdiction.

111.    Plaintiffs are likely to succeed on the merits because federal law does not permit the Band to exercise the jurisdiction asserted here.

112.    The balance of harms favors Plaintiffs because an injunction would prevent unlawful proceedings, while Defendants have no legitimate interest in exercising jurisdiction they do not possess.

113.    An injunction also serves the public interest by enforcing federal limits on tribal authority and preventing conflict with Wisconsin's sovereign authority over navigable waters.

### THIRD CAUSE OF ACTION: PERMANENT INJUNCTIVE RELIEF

114.    Plaintiffs re-allege and incorporate by reference the above allegations as if set forth herein.

115.    Plaintiffs are entitled to permanent injunctive relief barring Defendants from pursuing further claims against Plaintiffs in Tribal Court.

**WHEREFORE**, Plaintiffs pray for the following relief:

A.    For a declaratory judgment pursuant to 28 U.S.C. § 2201 that the Tribal Defendants may not assert or exercise regulatory or adjudicatory jurisdiction over Plaintiffs in the action currently filed in tribal court or in any other tribal administrative or judicial forum.

B.  For a preliminary injunction pursuant to Fed. R. Civ. P. 65 enjoining Defendants, and their agents, employees, successors, and assigns, from further proceedings against Plaintiffs in Tribal Court.

C.  For a permanent injunction pursuant to Fed. R. Civ. P. 65 enjoining Defendants, and their agents, employees, successors, and assigns, from further proceedings against Plaintiffs in Tribal Court.

D.  For an award of attorneys' fees and costs, to the extent permitted by law.

E.  For such other relief as may be just and proper.

Dated this 6th day of July, 2026.

Respectfully submitted,

**MICHAEL BEST & FRIEDRICH LLP**

By: */s/ Joseph L. Olson*
Joseph L. Olson, #1046162
jlolson@michaelbest.com
Alexander M. DeGuire, #1097948
amdeguire@michaelbest.com
790 N. Water Street, Suite 2500
Milwaukee, WI 53202
Telephone: 414.271.6560
Facsimile: 414.277.0656

*Attorneys for Plaintiffs*

24