IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

WHITE SAND LAKE ASSOCIATION, INC., PHEIFER BROTHERS CONSTRUCTION COMPANY, INC., CLARK ALBERT, RAY FRIGO, AMBER WINTER, DENISE ODELL, CONNIE WINTER, MIKE RUMMEL, LOUISE WALSH and MARY LOU FISHER,

Plaintiffs,

v.

JOHN D. JOHNSON, SR., THE TRIBAL COURT OF THE LAC DU FLAMBEAU BAND OF LAKE SUPERIOR CHIPPEWA INDIANS, MATTHEW FLETCHER and MELINDA YOUNG,

Defendants.

OPINION and ORDER

26-cv-615-wmc

---

Plaintiff White Sand Lake Association, Inc., was formed by a group of non-Indian individuals who live on or near White Sand Lake, a navigable lake located entirely within the borders of the Lac du Flambeau Indian Reservation in northern Wisconsin. After the Association hired a construction company to build a boat launch on one of its member's private properties abutting that lake, the Lac du Flambeau Band of Lake Superior Chippewa Indians notified the Association that construction of the boat launch violated several provisions of tribal law. After consulting legal counsel who opined that the Band had no legal right to control the building of a boat launch on private property owned by a non-Indian on navigable water, the Association refused to seek tribal permits and proceeded with construction.

Upon completion of construction in May 2025, the Association's members then began to use the boat launch, prompting the Band to file suit in its own tribal court against the Association, several of its individual members and Pheifer Brothers Construction Company (collectively "plaintiffs") and to obtain a preliminary injunction from that court purporting to block Association members from using the boat launch. In turn, plaintiffs filed their own lawsuit in this court, initially naming as defendants the tribal court, Tribal Court Judge Matthew Fletcher (a University of Michigan Law Professor, specially retained by the Tribal Band to reside over the dispute), the Band's president John Johnson, Sr., and the Director of the Band's Tribal National Resource Department, Melinda Young. Simultaneously, plaintiffs moved for a temporary restraining order and preliminary injunction prohibiting litigation of the dispute in tribal court, as well as any attempts by the Band to regulate or enforce a prohibition on Association members using the boat launch. (Dkt. #8.) This court denied the plaintiffs' request for a temporary restraining order but directed defendants to respond to their motion for a preliminary injunction request and supporting materials. The Band's President Johnson and NRD Director Young filed their opposition brief, after which this court held an evidentiary hearing on the preliminary injunction motion on August 11, 2026.[1]

For the reasons explained in more detail below, this court agrees that the tribal court lacks jurisdiction over the dispute between the Band and the Association, as well as its

[1] Neither Judge Fletcher nor any representative of the tribal court responded to plaintiffs' preliminary injunction motion, no doubt believing they were immune from suit as to any judicial action.

individual members and Pheifer Brothers Construction Company, at least as it concerns the construction and use of the Association's new boat launch. In particular, despite the Band's reasonable concerns that the boat launch will exacerbate problems related to the introduction of an invasive species known as Eurasian watermilfoil, the Band has failed to show that the Association's continued use of the boat launch is likely to threaten or directly affect the Band's basic "political integrity, economic security, health or welfare" as required before the Band or Tribal Court may exercise jurisdiction over nonmembers' conduct on non-Indian property under *Montana v. United States*, 450 U.S. 544, 566 (1981). Accordingly, the court will enter a preliminary injunction.

## BACKGROUND[2]

The Band's Lac du Flambeau Indian Reservation was established in 1854 as part of the "Treaty with the Chippewas." The Reservation covers roughly 87,195 acres, with nearly half of that acreage consisting of lakes, rivers and wetlands. White Sand Lake is a 1,229-acre navigable lake located completely within the exterior bounds of the Reservation's boundaries. White Sand Lake Association, Inc. is a Wisconsin corporation whose members are homeowners and residents on or near the lake. Plaintiff Mary Lou

[2] These background facts are based on plaintiffs' proposed findings of fact in support of their motion for preliminary injunction (dkt. #10), defendants' responses to those findings (dkt. #25), and the evidence in the record. The court notes that plaintiffs filed a motion for leave to file a reply to defendants' response to their proposed findings of fact (dkt. #29), which consisted largely of argument and legal conclusions. That motion will be denied.

Fisher owns shoreline property on which the boat launch was constructed by another plaintiff, Pheifer Brothers Construction Company, Inc.

Before 2023, Association members primarily accessed White Sand Lake through a public boat launch owned and operated by the Band. In 2023, the Band found Eurasian watermilfoil near the Band's boat launch. Because Eurasian watermilfoil can be spread by motorboat traffic, the Band closed its boat launch, first temporarily, then indefinitely beginning with the 2024 season. The launch has remained closed to everyone except for tribal members, who were allowed to use the boat launch on limited occasions in the Spring of 2025 and 2026 for subsistence fishing. Since discovering the Eurasian watermilfoil, both the Band and Association have spent money and time attempting to remove the weed from the lake.

The parties agree that at least two other, private boat launches remain open on White Sand Lake -- at Dilman's Bay Resort and Camp Wipigaki. The Band represents that it is unaware of any other operating boat launches on the lake, while the Association alleges that there are more than 20 other, ad-hoc launches, though it has failed to identify them specifically. Since the Band's boat launch closed, some Association members have paid up to $100 to launch boats at Dilman's or other locations. However, Dilman's event space was apparently damaged from use of the boat launch and is no longer open to Association members. (Dkt. #27-5.) No other boat launch owner would provide assurances of future access to Association members.

As a result, in late 2024, the Association decided to construct its own boat launch for its members' use, hiring Pheifer Brothers Construction Company to build the boat

launch on shoreline property owned by Association member Fisher. In January 2025, the Association presented its boat launch proposal to Vilas County. The Vilas County Board of Adjustment granted a shoreland-zoning variance to the Association for construction of the launch, but conditioned the building permit on the Association obtaining "all requisite permits from all concurrent jurisdictions." (Dkt. #7-1, at 4.)

As part of the variance process, Vilas County also notified the Band that the Association had applied for a permit. On January 7, 2025, Melinda Young, the Director of the Band's Natural Resource Department, sent a letter to Association members Fisher and Frigo, stating that because constructing a boat launch was a "federally regulated activity" under § 404 of the Clean Water Act ("CWA"), the Association needed to obtain federal CWA permits from the Band.[3] (Dkt. #27-3.) The letter also described the Band's certification process for obtaining a federal permit, instructing the Association to apply for an individual federal permit from the U.S. Army Corps of Engineers ("Corps") and concurrently request a Tribal Water Quality Certification from the Band's National Resources Department for the proposed boat launch project. Finally, the letter advised that construction could not commence until the permits had been approved. (*Id.*)

The Association responded to Young's letter on January 8, 2025, by stating that it had consulted with the Corps and was informed it required no federal approval because

---

[3] The Band has held Treatment-as-a-State ("TAS") status under the CWA Water Quality Standards program since 2008, meaning that the Band has federal authority to set local environmental and water quality standards and act as a certifying authority for projects that may result in discharge into waters of the United States on their Indian reservation. *See* 42 U.S.C. § 7601(d).

the Association's proposal involved: no work below White Sand Lake's ordinary high watermark; no discharges, dredge or fill material entering the lake; no pumping; and no work in wetlands. (Dkt. #7-3, at 1 and dkt. #27-4.) The Association further represented that it had consulted the Environmental Protection Agency and Wisconsin DNR, both of which stated that no permits were required from their respective agencies.

Specifically, the EPA advised that no permit for pollutant waste was needed under § 402 of the CWA -- the National Pollutant Discharge Elimination System -- because the boat launch construction would not "disturb more than one acre of land" and would not create "point source discharges of storm water during construction." (Dkt. #27-4, at 2.) The EPA also advised that no CWA § 404 or Tribal certification would be needed if the project would not include any discharge of dredge or fill material below the ordinary high-water mark of the lake. (*Id.*) Similarly, the DNR advised that because the Association's proposal included no work under the high water mark, no DNR permit was required. Finally, the Association reported to the Band that it had consulted with outside counsel, who provided a written opinion letter stating that tribal approval was not required. The Association shared the opinion letter with the Band, along with an analysis conducted by Environmental Protection Industries, an environmental engineering firm retained by the Association to review the proposed project, concluding that the construction of the launch would not impede or impact the water quality of White Sand Lake and would not negatively affect soil stability.

The Association began construction of its boat launch in May of 2025, clearing trees and other vegetation from Fisher's property. (Dkt. #7-4.) However, on May 13, President

Johnson sent a letter to Fisher and the Association's president, Clark Albert, stating that the boat launch lacked the Band's approval and violated tribal law. In response, Albert reiterated the Association's position that tribal authorization was not required to construct the boat launch. Two days later, while construction was ongoing, the Band's Natural Resources Department issued citations for violations of its Tribal Natural Resources Code to Fisher, Albert and Pheifer Brothers Construction Company. Each citation identified a potential penalty of up to $5,000.

Despite these citations, construction continued and the boat launch was completed in June of 2025. To mitigate potential invasive species and shoreline damage, the Association controls access to the boat launch with a locked gate and an Association member must supervise the launching and removal of all boats to ensure ballast tanks and live wells are drained and boats are cleaned and free of any invasive species before and after using the lake. The Association also uses grant money it obtained from Wisconsin DNR to provide boater education.

Even so, the Band maintains that the Association's boat launch has damaged the shoreline and increased the risk of invasive species. In particular, the Band represents that Association members were seen reversing vehicles into the lake below the ordinary high-water mark, as well as prop-dredging and power-loading their vehicles. On June 10, 2025, the Band filed a civil action against the Association, several of its individual members and Pheifer Brothers Construction Company in Lac du Flambeau Tribal Court seeking to prohibit use of the launch under various provisions of the tribal code designed to prevent environmental and cultural deterioration of the resources on the Reservation. The Band

further alleges that its Tribal Court had jurisdiction over the boat launch dispute under *Montana v. United States*, 450 U.S. 544 (1981), and tribal law. (Band's Am. Cpt. (dkt. #6-1) 3.)

The Association, members and construction company moved to dismiss the tribal court action for lack of jurisdiction. However, on April 30, 2026, the Tribal Court entered an opinion and order denying the Association's motion to dismiss and granting the Band's motion for a preliminary injunction preventing use of the boat launch. Specifically, Tribal Judge Fletcher held its jurisdictional authority derived from tribal law, not federal law, and that jurisdiction was proper because tribal constitutional and statutory law authorized and required the court to assume jurisdiction over activities and disputes that arise on the tribe's reservation. The tribal court then entered a scheduling order governing discovery and other matters. (Dkt. #28-8.) That court's scheduling order calls for discovery to proceed and a trial to proceed on August 20, 2027. On July 6, 2026, plaintiffs brought this lawsuit challenging the tribal court's jurisdiction.

OPINION

Plaintiffs request that the court enter a preliminary injunction: (1) halting current proceedings in tribal court; (2) vacating the tribal citations; and (3) enjoining defendants from enforcing any tribal regulations against plaintiffs with respect to their boat launch and access to White Sand Lake. Theis requested relief is based on their federal common law claim challenging the Lac du Flambeau Tribal Court's exercise of jurisdiction over the underlying dispute, as well as the Band's regulatory and adjudicatory authority over

plaintiffs. *See Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians,* 471 U.S. 845, 852 (1985) (recognizing common law cause of action challenging tribal court jurisdiction).

Preliminary injunctive relief is an "extraordinary equitable remedy that is available only when the movant shows clear need." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 661 (7th Cir. 2015); *see also Doe v. Univ. of S. Indiana*, 43 F.4th 784, 791 (7th Cir. 2022) ("A preliminary injunction is an extraordinary remedy never awarded as of right.") (quoting *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008)). To obtain a preliminary injunction, plaintiffs must show that: (1) they have "some likelihood of prevailing on the merits"; (2) traditional legal remedies would be inadequate; and (3) they will suffer irreparable harm without the relief. *Finch v. Treto*, 82 F.4th 572, 578 (7th Cir. 2023); *Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020). If plaintiffs meet each of these threshold requirements, the court proceeds to a balancing analysis, weighing the harm that plaintiffs would suffer absent a preliminary injunction against the harm the Band would suffer were a preliminary injunction issued, as well as considering whether an injunction is in the public interest overall. *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health*, 896 F.3d 809, 816 (7th Cir. 2018); *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018).

## I. Likelihood of Success on the Merits

As to whether plaintiffs are likely to succeed on the merits of their federal common law claim challenging the Band's and Tribal Court's jurisdiction over them, "some likelihood of success" is more than "a mere possibility of success," but "the applicant need

not show that it definitely will win the case." *Grubhub Inc. v. Relish Labs LLC*, 80 F.4th 835, 844 (7th Cir. 2023). Defendants respond that plaintiffs cannot succeed on the merits of their claim because they have not yet exhausted remedies available in tribal court, and even if they have, tribal court jurisdiction is proper.

This court has jurisdiction under 28 U.S.C. § 1331 to resolve plaintiffs' claim challenging a tribal court's exercise of jurisdiction over non-members. *Nat'l Farmers*, 471 U.S. at 857 ("§ 1331 encompasses the federal question whether a tribal court has exceeded the lawful limits of its jurisdiction[.]"); *see also Miccosukee Tribe of Indians of Fla. v. Kraus-Anderson Constr. Co.*, 607 F.3d 1268, 1274 (11th Cir. 2010) ("Whether a tribal court has adjudicative authority over nonmembers presents a federal question based on federal common law.").[4] Further, where tribal jurisdiction is lacking, federal courts may enjoin ongoing tribal judicial and enforcement proceedings. *Nevada v. Hicks*, 533 U.S. 353, 374 (2001); *Evans v. Shoshone-Bannock Land Use Policy Comm'n*, 736 F.3d 1298, 1302, 1307 (9th Cir. 2013); *Burlington N.R.R. Co. v. Red Wolf*, 196 F.3d 1059, 1065-66 (9th Cir. 1999) (affirming injunction against tribal court proceedings where jurisdiction was lacking);

---

[4] Tribal Judge Fletcher has opined in both legal scholarship and his recent opinion and order in the underlying tribal court action that the tribal court need not accept court-created, federal common law causes of action or legal conclusions. *See* Matthew Fletcher, *Resisting Federal Courts*, 81 U. Colo. L. Rev. 973, 1007 (2010); Tribal Court Order (dkt. #6-4, at 7) ("[T]here is no federal constitutional or statutory basis for the *Montana* general rule, rendering *Montana* unhelpful as a matter of tribal law."). Nevertheless, *this federal court is* bound by the United States Supreme Court's holding in *Nat'l Farmers* that non-Indians may bring a federal common-law cause of action to challenge the exercise of tribal jurisdiction, as well as the Supreme Court's holding in *Montana* limiting tribal jurisdiction over non-Indians. Perhaps the Band can persuade the Supreme Court to modify or overrule *Nat'l Farmers* or *Montana*, but until then, this court must abide by both rulings.

*McKinsey & Co., Inc. v. Boyd*, No. 22-cv-155-wmc, 2022 WL 1978735, at *2 (W.D. Wis. June 6, 2022) (enjoining tribal proceedings for lack of tribal jurisdiction).

Generally speaking, before bringing suit in federal court, even a non-Indian must first exhaust tribal remedies. *See Nat'l Farmers*, 471 U.S. at 855–56 (judicial review of "the existence and extent of a tribal court's jurisdiction ... should be conducted in the first instance in the Tribal Court itself"). "Ordinarily," consistent with that legal principle, therefore, "a federal court should stay its hand until after the Tribal Court has had a full opportunity to determine its own jurisdiction," *Strate v. A-1 Contractors,* 520 U.S. 438, 449 (1997), meaning after "an initial decision by the tribal trial court and the completion of [tribal] appellate review." *DISH Network Service, LLC v. Laducer*, 725 F.3d 877, 882 (8th Cir. 2013); *see also Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 17 (1987) ("At a minimum, exhaustion of tribal remedies means that tribal appellate courts must have the opportunity to review the determinations of the lower tribal courts.").

In this case, plaintiffs acknowledge their failure to exhaust tribal court remedies. Indeed, while the tribal court granted the Band's motion for a preliminary injunction and denied the Association's motion to dismiss, the tribal case is still in its early stages -- to date, there has been no final decision on the merits in tribal court, much less an appeal to a tribal appellate court. That said, the exhaustion rule is "prudential," not "an absolute bar to federal jurisdiction," and as such, subject to certain exceptions. *DISH Network*, 725 F.3d at 883 (citing *Strate*, 520 U.S. at 453). As relevant here, a party need not exhaust tribal adjudication where "it is plain" that a tribal court lacks jurisdiction over the parties or dispute, such that tribal adjudication "would serve no purpose other than delay." *Strate*,

520 U.S. at 459, n.14. However, this exception applies "'only if the assertion of tribal court jurisdiction is frivolous or obviously invalid under clearly established law.'" *Vipond v. DeGroat*, 166 F.4th 694, 699 (8th Cir. 2026) (citing *WPX Energy Williston, LLC v. Jones*, 72 F.4th 834, 838 (8th Cir. 2023)). "In circumstances where the law is murky or relevant factual questions remain undeveloped," "the exhaustion requirement [must] be enforced." *DISH Network*, 725 F.3d at 883.

Here, plaintiffs argue that they are not required to exhaust tribal remedies because the tribal court plainly lacks jurisdiction. Under well-established federal law, this court agrees. To determine whether tribal court jurisdiction is plainly lacking, the court considers whether such "jurisdiction is colorable or plausible." *Elliott v. White Mt. Apache Tribal Court*, 566 F.3d 842, 848 (9th Cir. 2008). The plausibility of tribal court jurisdiction depends on the scope of the Band's regulatory authority, as "a tribe's adjudicative jurisdiction does not exceed its legislative jurisdiction." *Strate,* 520 U.S. at 453.

Specifically, under well-established U.S. Supreme Court precedent, the Band lacks authority to regulate plaintiffs' boat launch project. The Supreme Court has now repeatedly held that "tribes do not, as a general matter, possess authority over non-Indians who come within their borders." *Plains Commerce Bank v. Long Family Land & Cattle, Co.,* 554 U.S. 316, 328 (2008) (citing *Montana,* 450 U.S. at 565); *see also Philip Morris USA, Inc. v. King Mountain Tobacco Co.,* 569 F.3d 932, 939 (9th Cir. 2009) ("As a general rule, tribes do not have jurisdiction, either legislative or adjudicative, over nonmembers, and tribal courts are not courts of general jurisdiction."). Particularly relevant here, "[t]his general rule restricts tribal authority over nonmember activities taking place on the

reservation, and is particularly strong when the nonmember's activity occurs on land owned in fee simple by non-Indians.'" *Plains Commerce,* 554 U.S. at 328 (quoting *Strate,* 520 U.S. at 446). Because there is no dispute that the non-Indian Association constructed its boat launch on plaintiff Mary Lou Fisher's non-Indian fee land, therefore, the Band's efforts to regulate plaintiffs' boat launch are "presumptively invalid." *Plains Commerce,* 554 U.S. at 330 (citation omitted).

Nonetheless, defendants argue that federal law provides two grounds under which the Band may regulate plaintiffs' activities on Fisher's fee simple land: (a) the Band's TAS status under the CWA; and (b) the so-called "second exception" recognized by the Supreme Court in *Montana.* Accordingly, the court turns to each of these grounds separately below.

### A. The Band's TAS Status under the CWA

Defendants first argue that the Band may regulate plaintiffs' boat launch project land under its TAS authority granted by the federal Environmental Protection Agency to enact water quality regulations for the entire reservation. (Def.'s Br. (dkt. #24) 40 ("The Tribe has the authority to promulgate and enforce water-quality regulations against nonmembers.").) This argument has potential merit, as tribal jurisdiction under the CWA extends to all land within a tribe's reservation, including non-Indian activities on non-Indian fee land within a reservation. *See* 33 U.S.C. § 1377(h) (defining "federal Indian reservation" as "all land within the limits of any Indian reservation under the jurisdiction of the United States government, notwithstanding the issuance of any patent, and

including rights-of-way running through the reservation."); Paula Goodman Maccabee, *Tribal Authority to Protect Water Resources and Reserved Rights Under Clean Water Act Section 401*, 41 Wm. Mitchell L. Rev. 618, 643–44, 649–50 (2015) ("Since at least 2010, the EPA has recognized prevailing legal authority that "tribal water quality standards and [section] 401 certification authority extend to non-Indian fee land within a reservation."); Stephanie L. Safdi, *Indigenous Water Governance and the Clean Water Act*, 45 Stan. Envtl. L.J. 1, 42 (2026) (explaining that EPA has interpreted Congressional delegation of authority to Tribes to administer CWA regulatory programs as applying to "entire reservations, including over nonmember activities on fee land," regardless whether an exception would apply under *Montana*).

The Supreme Court has also recognized that "where tribes possess authority to regulate the activities of nonmembers, 'civil jurisdiction over disputes arising out of such activities presumptively lies in the tribal courts.'" *Strate*, 520 U.S. at 453 (citation omitted); *FMC Corp. v. Shoshone-Bannock Tribes*, 942 F.s3d 916, 941 (9th Cir. 2019). Thus, if the Band's attempts to regulate plaintiffs' construction and use of the boat launch fell under its CWA authority to set and enforce water quality standards, the tribal court would arguably have jurisdiction to resolve the underlying dispute.

At this stage of the lawsuit, the fundamental problem with the Band's argument for independent regulatory authority under the CWA and TAS is its lack of meaningful development beyond merely asserting that the Band was enforcing "water quality standards." Indeed, defendants did not even mention the Band's TAS authority as a separate basis for the tribal court's exercise of jurisdiction during the August 11th

evidentiary hearing before this court; nor did the tribal court rely on the Band's asserted TAS authority in purporting to exercise jurisdiction over the dispute. Moreover, some of the Band's claims asserted in tribal court clearly fall outside the scope of CWA water quality standards, including the Band's claims that the Association injured wild plants and aquatic animals, violated boating safety ordinances, and violated cultural protection laws. (Band's Am. Cpt. In Tribal Ct. (dkt. #6-1).)

This is particularly problematic given the Corp's and EPA's opinion that no tribal water quality permit was required for the Association's boat project. Regardless, this argument is too poorly developed, as is the Band's TAS status, to encompass all of the Band's citations and tribal court claims. Thus, neither the CWA nor the Band's TAS status provides a valid basis for its actions against plaintiffs' installation and use of a boat launch or the tribal court's jurisdiction over that underlying dispute.

**B. Second *Montana* Exception**

Defendants instead spend most of their opposition to plaintiffs' preliminary injunction motion in writing and at oral argument on the so-called "second exception" to *Montana*'s general rule prohibiting tribal regulation of non-member activities on non-Indian fee land, which permits such regulation of nonmember "activity that directly affects the tribe's political integrity, economic security, health, or welfare." *Montana,* 450 U.S. at 564–67. However, the burden rests on the Band to establish this exception, *Plains Commerce,* 554 U.S. at 330, and it only applies to conduct that "imperil[s] the subsistence" of the tribal community such that "tribal power must be necessary to avert catastrophic

consequences." *Plains Commerce*, 554 U.S. at 341. Thus, "that burden is difficult to meet," *McGowan v. Tix*, 161 F.4th 1118, 1124 (8th Cir. 2025), and defendants have so far fallen well short of making a colorable case for its application here.

In fairness, defendants parade out a variety of possible problems flowing from the construction and ongoing use of the boat launch, including: (1) damage to vegetation on Fisher's land during construction; (2) spread of Eurasian watermilfoil; and (3) harm to fish spawning beds and other aquatic wildlife. Defendants then argue that these concerns at least plausibly support tribal jurisdiction under the second *Montana* exception. However, so far, these concerns are almost entirely speculative and unsupported by specific evidence tying them to the Association's use of the new boat launch, much less rising to a level imperiling the Band's viability. Moreover, as discussed above, the Association has engaged in efforts to curb and remediate Eurasian watermilfoil proliferation in White Sand Lake, as well as to mitigate damage to the shoreline where the boat launch is located. The record evidence provided by defendants themselves also shows that there are numerous, other boat docks and motorboats using the lake that presumably could spread Eurasian watermilfoil without restriction by the Band at all. (Lake photos (dkt. #27-7, 27-8, 27-9).

This is not to suggest that a record could not be made that demonstrates the ongoing risk to the environmental health of Northern Wisconsin freshwater lakes and streams must be imperiled by a lack of adequate regulation and restriction on further development. Indeed, the Wisconsin DNR actually charged with regulating navigable waterways in the State has recognized and is addressing a number of such concerns, including the spreading

of Eurasion watermilfoil, among many others.[5] As the court noted at oral argument, however, if the Chippewa Band Tribes want to make the case for an existential crisis requiring tribal regulation generally reserved to the State as to navigable waters under *State of Wisconsin v. Baker* ("*Baker II*"), 698 F.2d 1323, 1335 (7th Cir. 1983), they should be attempting to reach a joint agreement on appropriate regulations or, failing that, bring a federal declaratory judgment action justifying their own regulations by making a convincing, comprehensive case that their way of life is imperiled, under the second *Montana* exception, not by singling out a small number of non-Indian landowners with limited resources to fight back to flex tribal authority over an isolated road or single boat launch. *E.g., United States v. Town of Lac du Flambeau*, 797 F. Supp. 3d 894, 902 (W.D. Wis. 2025).

Regardless, on the current record, defendants have wholly failed to show that the Association's single boat launch would exacerbate the Eurasian watermilfoil problem to such an extent that it could imperil the Band's political integrity, economic security, health or welfare such that its regulation is necessary to avert catastrophe. In contrast, the Association has shown a substantial likelihood that the Band cannot regulate its boat launch under the second *Montana* exception, the tribal court plainly lacks jurisdiction over the dispute, and the Association need not exhaust tribal remedies before filing suit in this

[5]*See* Hennessy Decl. (dkt. #28 in *State v. Johnson, et al.*, case no. 26-cv-401 (W.D. Wis. May 22, 2026) (natural resources specialist from Wisconsin DNR discussing state and cooperative programs that exist for managing lakes and fisheries); https://dnr.wisconsin.gov/topic/Invasives/prevention;https://dnr.wisconsin.gov/topic/Lakes/SayYesToLakes.

court. *E.g., Evans*, 736 F.3d at 1303 (holding that plaintiff "need not exhaust tribal remedies" where "the tribal court plainly lacks jurisdiction"); *McKinsey*, 2022 WL 1978735, at *2 ("[W]hen it is clear that tribal courts lack jurisdiction . . . adherence to the tribal exhaustion requirement in such cases would serve no purpose other than delay, and is therefore unnecessary.") (citation omitted).

Accordingly, because defendants have identified no legal basis for the assertion of tribal jurisdiction over the plaintiffs, plaintiffs' likelihood of success on the merits of their claim is very high.

## II. Lack of Legal Remedies and Irreparable Harm

Given such a strong showing on the likelihood of success on the merits of their jurisdictional challenge, plaintiffs need not make any significant showing on the other preliminary injunction factors. *See Valencia v. City of Springfield, Ill.*, 883 F.3d 959, 966 (7th Cir. 2018) (explaining that motions for preliminary injunction are subject to a "sliding scale approach: the more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor"). Even if this sliding scale were not so favorable to plaintiffs, they have also shown "no adequate remedy at law" is available to them without injunctive relief. *Finch*, 82 F.4th at 578. Specifically, plaintiffs are currently being deprived of the use of their own private property to access White Sand Lake, as well as the benefits of access to the lake and their sunk costs. Further, to launch their boats, Association members must now pay up to $100 a time at other private launches to access the lake, assuming that any such launches will continue to grant permission to use their launch sites. Finally,

although defendants argue that such monetary harm does not qualify as irreparable, defendants' counsel conceded at the evidentiary hearing that plaintiffs would likely be unable to recover from the Band, as a sovereign nation immune from suit, even plaintiffs' launch fees paid to other private boat launch owners, much less difficult to measure damages stemming from ongoing deprivation of property rights. Accordingly, this factor also strongly favors granting plaintiffs' request for preliminary injunctive relief.

### III. Balance of Harm and the Public Interest

Finally, the balance of equities favors plaintiffs as well, again particularly given their high likelihood of success on the merits. For plaintiffs, the harms are concrete and immediate: deprivation of property rights, loss of lake access, financial burdens from paying for launch at alternative sites, and the ongoing expense and exposure to likely unlawful proceedings in tribal court. On defendants' side, an injunction would simply prevent the Band from exercising tribal jurisdiction over a lone launch site on one navigable lake out of more than 100 on its Reservation, a power it more than likely does not possess under federal law anyway.

As for the public's interest, an injunction appears to merely enforce the status quo and the limits imposed on unfettered tribal authority long-established by the United States Supreme Court, as well as preventing further jurisdictional uncertainty and conflict over this ongoing dispute in two jurisdictions. If nothing else, the public interest is served by maintaining this now established legal framework unless or until that framework is modified by Congress or the Supreme Court. Accordingly, the court is persuaded that the

balance of equities in enforcing an injunction weighs heavily in favor of plaintiffs and the public interest. Therefore, a preliminary injunction will be entered barring defendants from proceeding further in tribal court, which is stayed, or enforcing tribal ordinances against plaintiffs' use of their private boat launch, which is preliminarily enjoined, both until further order of this court.

ORDER

IT IS ORDERED that:

1) Plaintiffs' motion for preliminary injunctive relief (dkt. #8) is GRANTED as follows:

    a) defendants are PRELIMINARILY ENJOINED from enforcing tribal ordinances against plaintiffs' construction, operation or use of the private boat launch on White Sand Lake located on the shoreline property at 2977 County Highway H, Lac du Flambeau, Wisconsin, pending final resolution of this action;

    b) the case *Lac du Flambeau v. White Sand Lake Association, et al.*, Case No. 25-CV-034, pending in Lac du Flambeau Tribal Court is STAYED in its entirety until full and final resolution of this action;

    c) enforcement of any kind of the Tribal Court's preliminary injunction issued on April 30, 2026, in the case *Lac du Flambeau v. White Sand Lake Association, et al.*, Case No. 25-CV-034, is also STAYED in its entirety until full and final resolution of this action;

d) no enforcement action, judicial proceedings, or any other proceedings of any kind may be taken by defendants with regard to the citations issued to plaintiffs by the Band pending full and final resolution of this action; and

e) plaintiffs may continue operation and use of the boat launch in accordance with Vilas County Zoning Permit obtained on April 28, 2025, and all other applicable regulations pending full and final resolution of this action.

2) Plaintiffs' motion for leave to file a reply to defendants' response to plaintiffs' proposed findings of fact (dkt. #29) is DENIED.

3) Under Fed. R. Civ. P. 65(c), plaintiff shall not be required to post a bond at this time.

Entered this 31st day of August, 2026.

BY THE COURT:

/s/

WILLIAM M. CONLEY
District Judge